IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


LARRY SHOPTEESE,

        Petitioner,

    v.                        Case No. 12-3084-SAC

DOUG WADDINGTON, et al.,

        Respondents.


**MEMORANDUM AND ORDER**

This case comes before the Court on Petitioner's motion for a writ of habeas corpus pursuant to 28 USC § 2254, and on his related motion for an evidentiary hearing. Petitioner, in custody at Lansing, contends that he was denied his right to effective assistance of trial counsel.

**Procedural Background**

Upon being charged with felony murder, aggravated robbery, aggravated battery, aggravated burglary, burglary and theft, Petitioner initially entered a plea of not guilty. Thereafter, Petitioner's attorney, Mr. Tuley, filed a successful motion to determine competency, Petitioner was evaluated and treated at Larned State Hospital for approximately nine months. Eventually, he was found to be competent to assist in his defense. Although a clinical psychologist later found Petitioner incompetent, the

district court denied the ensuing motions of Petitioner's counsel to determine competency and for a medical evaluation.

Thereafter, Petitioner's counsel advised Petitioner to plea no contest to felony murder and to aggravated burglary in exchange for the State's dismissal of the remaining charges. A plea hearing was held on January 30, 2004. Following his no contest plea, Petitioner was convicted in the District Court of Brown County, Kansas, of one count each of first degree (felony) murder and aggravated burglary.

Petitioner was sentenced on the felony murder charge to a term of life imprisonment without the possibility of parole for twenty years, to run consecutively to a term of 34 months imprisonment for the aggravated burglary charge. Six days after his sentence, Petitioner began writing the judge, saying he could not reach his counsel but wanted to appeal, wanted to go to trial, and wanted to withdraw his plea. Mr. Tuley died, and Mr. McQuillen was appointed to represent Petitioner at the hearing to withdraw his plea.

At the evidentiary hearing to withdraw his plea, Petitioner's counsel argued that such relief was warranted because Mr. Tuley had told Petitioner that he would be eligible for parole after 15 years, and that Petitioner contended he had never signed the plea agreement. Mr. McQuillen also asked the court to take judicial notice of Petitioner's IQ and his mental illness, and offered Petitioner's testimony. Petitioner testified that Mr. Tuley

had told him that he would be eligible for parole after 15 years, and that if he had known that statement was erroneous he would not have taken the plea. Mr. McQuillen did not believe that Petitioner's competency was an issue, having reviewed the plea colloquy and other documents of record, and having met several times with Petitioner. The court reviewed the facts, made lengthy findings, then denied the motion to withdraw the plea.

Petitioner appealed his conviction, represented by yet another counsel, claiming only that his motion to withdraw his plea should have been granted because he was incompetent to enter his plea due to his low IQ and his unmedicated mental illness. The Kansas Supreme Court affirmed Petitioner's convictions, finding that although defendant's competence was initially dubious, the relevant circumstances showed that his no contest pleas were knowingly and voluntarily entered with an understanding of the nature of the charges and the consequences of his pleas. *State v. Shopteese*, 283 Kan. 331 (2007).

Petitioner additionally filed for post-conviction relief pursuant to K.S.A. 60-1507, alleging Mr. McQuillan was ineffective in representing Petitioner on his motion to withdraw his plea. Petitioner's memorandum in support of that motion added a claim that Mr. Tuley was ineffective at and before the Petitioner's plea hearing. The District Court denied that motion. Petitioner appealed, but the Kansas Court of Appeals affirmed the denial of the motion, *Shopteese v. State,* 256 P.3d 897, 2011 WL 3276224 (Kan. Ct. App., July

29, 2011) (Case No. 103,349) (Unpublished Opinion), and the Kansas

Supreme Court thereafter denied review. Petitioner then filed this timely

application for federal habeas corpus relief.

## Facts

The relevant facts, as determined by the Kansas Supreme Court,

follow.

On February 19, 2002, Cletuis Samqua and his daughter, Judy, arrived home to find Shopteese in their living room. Although details were disputed, the results of the encounter were that Shopteese shot and killed Cletuis and took money from Judy before she fled to a neighbor's house. Shopteese took firearms from the home and money from Cletuis' wallet. He then he fled into nearby woods, where he lived on berries and pond water for 2 days before he was apprehended.

Shopteese was charged with felony murder, aggravated robbery, aggravated battery, aggravated burglary, burglary, and theft. Counsel was appointed, and Shopteese entered a not guilty plea. Eventually, this lawyer withdrew, and a new lawyer was appointed. In early December 2002, the new lawyer sought and obtained a competency evaluation of Shopteese.

Dr. David Elsbury, of the Kanza Mental Health and Guidance Center, filed a report on December 16, but Elsbury was unable to make a determination of Shopteese's competency. Elsbury's report noted that Shopteese had finished eighth grade, had unsuccessfully attempted to obtain a GED, and functioned between a second- and fourth-grade level. Shopteese was "oriented to time, place, person, and situation" and "alert and capable of listening and following instructions"; however, Shopteese reported hearing voices and "shushing sounds" that interfered with his ability to concentrate or follow conversations. Shopteese also reported visual hallucinations, such as floating animals. Elsbury suggested that Shopteese "demonstrated the capacity to understand his current legal situation and could name and generally describe the charges against him"; he also had "a good capacity to understand and disclose to counsel available pertinent information surrounding the alleged offenses. ….. He wants to protect himself in the legal process and use his attorney in that task." However, Elsbury noted: "The defendant has a weak understanding of the possible pleas and what they mean. The defendant's view of the possible consequences if found guilty seem

incomplete and he doesn't appear to have an adequate grasp of the seriousness of the charges and the full range of penalties that could be levied against him." Elsbury diagnosed Shopteese with "Psychotic Disorder, Not Otherwise Specified" and "Mild Mental Retardation."

Elsbury recommended Shopteese be sent to Larned State Security Hospital (Larned) for further evaluation. After a hearing on December 20, the district court judge entered an order consistent with the recommendation.

Shopteese was admitted to Larned on January 7, 2003, and remained there for evaluation and treatment for 3 months. A March 5, 2003, report by Dr. J.L.L. Fernando suggested Shopteese was not competent to stand trial at that time, although he probably would become competent in the foreseeable future. Fernando noted that defendant reported vague hallucinations, which, Fernando suggested, could be related to head trauma or "huffing" of gasoline vapors. Fernando also noted Shopteese's limited intelligence, his distracted nature, his low cognitive functioning, and his illiteracy. Fernando suggested these attributes hindered Shopteese's competence and would make it difficult for him to work with an attorney "in the preparation and presentation of a legal defense." Fernando nevertheless concluded that Shopteese's "borderline intellectual functioning" was not the primary reason for his confused thoughts, and that "treatment in the form of psychotropic medication would likely allay his symptoms." Like Elsbury, Fernando diagnosed Shopteese with "Psychotic Disorder, Not Otherwise Specified" and what he called "Borderline Intellectual Functioning."

The district court judge held a competency hearing on March 21, 2003, and, based on Fernando's report and testimony along with Elsbury's report, found Shopteese incompetent to stand trial. The judge ordered Shopteese committed for additional evaluation and treatment at Larned for 3 more months.

On May 21, 2003, Dr. Dara Johnson of Larned informed the court that Shopteese remained incompetent to stand trial but certified that he had a substantial probability of attaining competency in the foreseeable future. Johnson recommended Shopteese remain at Larned, which he did.

On September 5, 2003, Dr. Leonardo Mabugat of Larned submitted a report indicating Shopteese was then competent to stand trial, despite Mabugat's agreement with Shopteese's earlier diagnoses of "Psychotic Disorder, Not Otherwise Specified, and Borderline Intellectual Functioning." Mabugat's examination revealed that Shopteese "displayed good understanding of the courtroom proceedings, the roles of the participants in a criminal trial and his expected behavior in court. He expressed his willingness to work with

his attorney" and "expressed his intention to remain at [Larned] instead of going back to court to face his legal problems." In Mabugat's opinion, Shopteese had begun malingering. He "was seen to deliberately give indirect responses to convince the team he was not competent to stand trial." Shopteese was taking sleep and antipsychotic medication. "In order to remain competent and maintain affective stability," the Larned staff recommended that Shopteese continue these medications.

Based on the Larned reports, the district court judge set Shopteese's trial for February 2, 2004.

On January 2, 2004, Shopteese's counsel submitted a new motion to determine competency, accompanied by an affidavit from Dr. Robert Barnett, an expert hired to testify concerning a mental disease or defect defense.

On January 29, 2004, the State filed an amended complaint charging only felony murder, aggravated robbery, and aggravated burglary. Shopteese and the State eventually agreed that Shopteese would plead no contest to the murder and aggravated burglary charges, in exchange for the State's dismissal of the remaining aggravated robbery charge. Shopteese's counsel filed a statement regarding plea negotiations, affirming that he had explained to his client the details of the charges, the possible sentences, the effect of the pleas, and the fact that the judge alone would decide on sentences. Counsel further affirmed that Shopteese understood and that it was Shopteese's decision to enter the pleas.

The district judge's January 30, 2004, plea hearing journal entry states:

> "[T]he defendant satisfactorily assures the Court that he enters the plea of no contest to Counts I and III of the State's amended complaint with full understanding of the nature and consequences of the plea, with full knowledge of the constitutional rights which he has as a defendant and of the specific constitutional rights he is waiving by entering his plea."

During the plea hearing, the following colloquy occurred:

"Q. [The Court]: Are you under any order of disability based upon a mental illness petition to your knowledge?

"A. [Defendant]: No, sir.

"Q. Are you taking any prescription medication?

"A. Yes, sir.

"Q. Would you tell me what that is if you know?

"A. Geodon and Trazodone.

"Q. Are you taking those regularly?

"A. Yes.

"Q. Are they prescribed by a doctor?

"A. Yes.

"Q. And have you taken them within the last 7 days?

"A. I ran out of medication, sir.

"Q. When?

"A. Let's see, I ran out of them I think it was Monday.

"Q. Do they know that?

"A. Yes.

"Q. And are they obtaining those for you?

"A. I put in a request for them to see the doctor but the doctor hasn't come in yet.

"Q. So you're awaiting to go see the doctor?

"A. Yes.

"Q. Are you feeling physically sick today?

"A. No.

"Q. Can you understand what I'm saying?

"A. Yes, sir.

"Q. Are you seeing anything floating in the air or anything like that?

"A. Yes, sir.

"Q. What?

"A. A 3–D version of everything. I'm cross-eyed, sir.

"Q. So that's what you're having trouble with is your eyes are cross and that causes you to have blurred vision?

"A. Yes, sir.

"Q. Can you hear me though?

"A. Yes, sir.

"Q. I see that you're wearing glasses. Are the glasses not strong enough to correct your vision problem?

"A. I had them since I was 13, sir.

"Q. But it's not affecting your ability to visit with Mr. Tuley or hear what I'm asking you is it?

"A. No, sir.

"Q. Are you feeling any pains or problems because you haven't had that medication in the last couple days?

"A. No, sir.

"Q. Are you taking any kind of over-the-counter medication like Advil or Tylenol or anything like that?

"A. No, sir.

"Q. Are you taking any kind of herbal supplements like echinacea or any of those kind of things?

"A. No, sir.

"Q. Are you under the influence of any alcohol, intoxicant of any kind, cereal malt beverage, beer, liquor, wine, nonprescribed drugs, or toxic vapors or inhalants?

"A. No, sir.

"Q. Are you taking any kind of substances drug or otherwise that would defeat your ability to think clearly, focus your attention on the issues before you, to communicate with others including Mr. Tuley your attorney, and to make important personal decisions on your own?

"A. No, sir.

"Q. Do you want me to break that one down?

"A. I understand, sir.

....

"Q. Mr. Shopteese, when I asked you a couple of questions about, were you having trouble seeing things or seeing things?

"A. Yes, sir.

"Q. You indicated you see things in 3–D because you're cross-eyed?

"A. Yes, sir.

"Q. That isn't that you're seeing buildings flying around and things like that, it just happens to be it blurs your vision?

"A. No, sir it's not all, but I have other I don't know how you would say visions, but they're just it's just a big story to talk out.

"Q. You're not having one of those today are you?

"A. Yes, I am.

"Q. Are you having it right now?

"A. Yes.

"Q. What are you seeing?

"A. Well, like different—I look at the wall or so and it has looks like they're all red, all red different designs, like people.

"Q. Now, are they doing anything to you, Mr. Shopteese, are they scaring you?

"A. Every time I turn to look at something different it stays the same picture and just floats.

"Q. All right, Mr. Shopteese, have you been able to understand what we're talking about today?

"A. Yes, sir I understand.

"Q. These things whatever this is that you visualize on the wall or anything like that, that's not affecting your ability to listen and make your decision today is it?

"A. I've learned to try to block that out.

"Q. Okay. And that's part of the cross-eye that you have or the vision problem that you have; is that correct?

"A. Yes, sir.

"Q. All right. And that's your physical vision. That's you looking through your eyeballs, correct?

"A. Yes, sir."

On March 10, 2004, the district judge sentenced Shopteese to life without parole for 20 years on the murder conviction, to run consecutive to a term of 34 months' imprisonment for aggravated

burglary. Six days later, Shopteese sent a handwritten note to the district judge, saying he "would like to appeal [his] case & [he] would like to go to trial." He sent a second note on March 25, saying he was having trouble reaching his attorney but would "like to put in a motion to go to trial and appeal [his] case." Shopteese's appointed counsel had filed a notice of appeal on March 15.

On March 31, Shopteese sent a third letter saying: "I would like to withdraw my Plea" because "I did not know what would happin [*sic*], I wouldn't have took in the Plea, the Plea was not followed and I didn't want to take the Plea. I would like to go to trial."

Shopteese's counsel died January 23, 2005, and new counsel was appointed on the appeal. The case was remanded to the district court for a hearing on Shopteese's request to withdraw his pleas.

At the hearing, counsel argued: (1) Shopteese did not understand the nature of the plea agreement and knew only what he was assured by his appointed counsel at the time, *i.e.,* that the sentences would run concurrent rather than consecutive and that he would be eligible for parole after 15 rather than 20 years; and (2) the signature on the plea agreement filed with the court was not Shopteese's signature. Counsel also asked the court to take judicial notice of record information on Shopteese's marginal I.Q. and mental illness.

Shopteese testified at the motion hearing. He acknowledged he was present at the plea hearing and signed something at a table in open court, but he said the document he signed was not the plea agreement. He maintained that he had not seen or read the plea agreement that appeared in the record until the week of the hearing on his motion to withdraw his pleas. Had he seen it earlier, he asserted, he would not have agreed to it. Shopteese suggested that a KBI employee had forged his signature on the agreement in the court file. Shopteese also testified that the document he had signed said "I plead no contest that the judge saying that I'm such a young age, I plead no contest to 15 years and be eligible for parole right after that." He said his mother and his former counsel's secretary had copies of the correct document. Shopteese testified on cross-examination that he did not remember the court showing him the plea agreement in the record or asking him if he understood that the court was not bound by his counsel's motion for concurrent sentences. When confronted with the plea hearing transcript, he suggested that it was "a lie." He admitted, however, that he did not have any complaint until after sentencing. On redirect, Shopteese said he had understood the plea agreement to mean he would receive concurrent sentences and would be eligible for parole after 15 years. Had he known the plea agreement

would permit him to receive consecutive sentences and go without a chance at parole for 20 years, he would not have entered into it.

After a lengthy discussion about what transpired at the plea hearing, the district judge made specific findings that Shopteese had been informed of the potential range of sentences and of his rights, including those he was waiving by pleading no contest. The judge also found that Shopteese was aware the court was not bound by any sentencing recommendation. The judge recited portions of the transcript from the plea hearing in which Shopteese's signature was authenticated. The judge then made findings that Shopteese had been represented by competent counsel; that he had not been misled, coerced, mistreated, or unfairly taken advantage of; that the plea was freely, fairly, and understandingly made; and that Shopteese met the requirements for mental competence. The judge noted that Shopteese

> "had a sufficient present ability to consult with his attorney which he showed with a reasonable degree of rational understanding. He appeared to understand the questions I was asking. He was able to make a proper response.... He understood what he was there for. He understood what the charges were.... [H]e met the standards for mental competence."

Based on these findings, the district judge concluded that the there was no manifest injustice requiring withdrawal of Shopteese's pleas.

*Shopteese*, 283 Kan. at 332-39.

Thereafter, Petitioner filed a K.S.A. 60-1507 motion, for which an

evidentiary hearing was held. The relevant facts, as stated by the Kansas

Court of Appeals in affirming the denial of that motion, follow.

> On March 12, 2008, Shopteese filed the K.S.A. 60–1507 motion at issue in this appeal, which alleged ineffective assistance of counsel by McQuillan at the hearing on the motion to withdraw his pleas. Specifically, Shopteese alleged McQuillan was ineffective because he "failed to argue on any substantial grounds that Mr. Shopteese was not competent to enter the plea of no contest" and only offered Shopteese's testimony in support of the motion. To that end, Shopteese alleged McQuillan failed to present the expert testimony necessary to establish Shopteese was not taking his medication as prescribed when he entered his pleas of guilty at the hearing. Although only mentioned in passing, Shopteese also alleged that McQuillan

failed to remind the court at the hearing that Tuley had misinformed Shopteese about parole eligibility.

Attached to the K.S.A. 60–1507 motion was an affidavit from Dr. Barnett stating that, based upon his reading of the plea hearing transcript, "it was highly improbable that Mr. Shopteese was competent at this hearing." Specifically, Dr. Barnett stated that if Shopteese was not taking his medication as prescribed at the time of the hearing, Shopteese likely experienced increased anxiety and the return of psychotic symptoms, and the judge "could not and did not accurately determine the nature of Mr. Shopteese's psychotic episode at the Guilty Plea Hearing."

At the evidentiary hearing on Shopteese's motion, McQuillan testified he had practiced law for 27 years and handled thousands of criminal cases. McQuillan stated that after he was appointed to represent Shopteese, he familiarized himself with the process utilized to assess Shopteese's competency. He stated that he initially had concerns regarding Shopteese's competence when he received the file but did not think it was an issue after reading the plea hearing transcript and meeting with Shopteese. McQuillan stated that during these meetings, Shopteese "seemed very functional" and "cognizant" when answering questions about the conversations he had with Tuley and about his plea hearing, which eliminated any concerns McQuillan may have had about Shopteese's ability to function in a court hearing. Although McQuillan conceded he did not contact any doctors to determine what effect a lack of medication would have had on Shopteese, McQuillan believed the plea hearing transcript established Shopteese was competent when he entered his no contest pleas. With regard to strategy at the hearing, McQuillan noted that Shopteese's request to withdraw his pleas rested primarily on his belief prior to sentencing that he was going to be eligible for parole in 15 years and receive concurrent sentences. As such, McQuillan opted to attack the validity of the no contest pleas based on the fact that Shopteese misunderstood the possible sentence upon entry of such a plea.

Dr. Mabugat testified regarding the medication prescribed to Shopteese. At some point during the evidentiary hearing, the parties discovered that Shopteese's daily dosage of Geodon was reduced by half when Shopteese was returned to the Brown County jail after being declared competent to stand trial. When asked about the effect of a reduction or discontinuation of the medication, Dr. Mabugat responded: "A reduction in the dosage will not exactly produce a full-blown destabilization. Some destabilizing factors will play a role. There might be a minor change in the patient's behavior that would require the medication to be put back to the original dose." When asked about the September 2003 written report deeming Shopteese competent to

stand trial in light of the possibility that Shopteese was not taking his medication as prescribed at the time of the plea hearing, Dr. Mabugat stated: "I would—I can support what I have written if the medication and the dosage that I prescribed would have been adhered to."

On cross-examination, Dr. Mabugat agreed that during the 8 months within which he monitored Shopteese, Mabugat never observed Shopteese experience a psychotic episode, regardless of whether he was on or off his medication. Mabugat also verified information contained in his report documenting the fact that Shopteese deliberately made false and misleading statements in an effort to remain at Larned and avoid going back to court to face criminal charges. Mabugat thereafter testified that an individual who experiences hallucinations can still be competent to stand trial if that person can function in the court proceedings. According to Mabugat, the test is to review how the participants involved in the proceedings perceive the individual's ability to function.

Dr. Barnett also testified and reiterated his conclusion that Shopteese was not competent at the time of the plea hearing.

Dr. Sean Yutzy, a physician specializing in psychiatry and subspecializing in forensic psychiatry at the University of New Mexico, testified at the hearing on behalf of the State. Yutzy testified that he currently served as the medical director of a team taking care of individuals with schizophrenia and was also the medical director of the Consultation Liaison Service at the university hospital. In addition to these duties, Yutzy stated that he also functions as a forensic psychiatrist. In this capacity, he performs evaluations of individuals in both criminal and civil contexts.

At the State's request, Dr. Yutzy reviewed the documents in the 2009 case to determine if he could form any opinions regarding Shopteese's competency to enter a plea. Yutzy diagnosed Shopteese with psychosis, not otherwise specified, mild mental retardation, a history of traumatic brain injury, and a history of malingering.

Dr. Yutzy concluded that Shopteese's I.Q. would not qualify as a mental disease or defect for the purpose of his capacity to enter a plea. Based upon Shopteese's treatment history, Yutzy did not believe the psychosis disorder represented a major mental illness. Yutzy concluded that Shopteese had the capacity to enter a plea and demonstrated that capacity at the plea hearing. He also noted the exhaustive assessment of Shopteese by the district court during the plea hearing, commenting that it was more exhaustive than other plea hearings he had observed in the past.

After considering the evidence presented and the arguments of counsel, the district court ultimately denied Shopteese relief on his claim that McQuillan rendered ineffective assistance of counsel at the

hearing on the motion to withdraw pleas. In a thorough and well-reasoned memorandum decision, the court found that McQuillan properly raised the issue of whether Shopteese had received incorrect advice from Tuley concerning parole eligibility. The court further found that there was nothing deficient in McQuillan's decision to forego presenting evidence or argument about Shopteese's competency at the plea hearing. In addition, the court noted that the issue had been raised and rejected by the Supreme Court in Shopteese's direct appeal.

*Shopteese*, 2011 WL 3276224, at *8-9.

## AEDPA Standard

This matter is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. ————, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (citation and internal quotation marks omitted). Under AEDPA, where a state prisoner presents a claim in habeas corpus and the merits were addressed in the state courts, a federal court may grant relief only if it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to clearly established Federal law" when: (a) the state court " 'applies a rule that contradicts the governing law

set forth in [Supreme Court] cases' "; or (b) " 'the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent .' " *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct legal rule from Supreme Court case law, but unreasonably applies that rule to the facts. *Id.* at 407–08. Likewise, a state court unreasonably applies federal law when it either unreasonably extends, or refuses to extend, a legal principle from Supreme Court precedent where it should apply. *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008).

In reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In order to obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring). "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their

independent judgment would conclude the state court misapplied Supreme Court law." *Maynard,* 468 F.3d at 671.

**Issues**

In his petition, Petitioner contends that his right to effective assistance of counsel was denied in the following respects: 1) at the hearing on his motion to withdraw Petitioner's plea, his attorney (Mr. McQuillan) did not offer any evidence of his incompetency except Petitioner's own testimony; and 2) Mr Tuley, his counsel at the plea hearing, did not try to stop the hearing despite Petitioner's obvious incompetence as shown by Petitioner's statement that he was not on his medications and by Petitioner's psychotic hallucinations during the hearing, and despite counsel's erroneous advice to Petitioner about his eligibility for parole on his felony murder life sentence.

### Mr. Tuley's Effectiveness

The memorandum in support of this petition, filed by the same counsel who filed this petition, addresses only the first issue noted above. Dk. 5, p. 2. Petitioner has thus abandoned the issue of Mr. Tuley's effectiveness. *See Reedy v. Werholtz,* 660 F.3d 1270, 1274 (10th Cir. 2011). Accordingly, the Court examines only whether Mr. McQuillan was constitutionally ineffective at the plea withdrawal hearing in failing to present expert testimony of Petitioner's incompetence, such as was presented at his 60-1507 hearing.[1]

### Mr. McQuillan's effectiveness

---

[1] The Court finds it unnecessary to address the State's contention that this issue is procedurally defaulted.

## Clearly Established Federal Law

To prevail on a claim for ineffective assistance of counsel, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, at 691, But "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* An applicant who challenges his counsel's effectiveness because of his failure to investigate must establish that the decision not to investigate was unreasonable from counsel's perspective at the time the decision was made. *See Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 859 (10th Cir. 2005).

In reviewing for deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, at 689. A petitioner demonstrates deficient performance by showing counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. Petitioner must show that

counsels' decision was "completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999).

"When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, ___ U.S.___, ___, 131 S.Ct. 770, 788 (2011). Thus Petitioner's burden on this habeas review is to show that there is no reasonable argument that his trial counsel satisfied *Strickland's* deferential standard. *See White v. Medina*, 2012 WL 401518, *2 (10th Cir. 2012).

The conviction of an accused person while legally incompetent violates due process. *See Pate v. Robinson,* 383 U.S. 375, 378(1966). The test for determining competency to stand trial is well-established. The court must consider "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402 (1960). The standard of competence to enter a plea is identical. *Godinez v. Moran,* 509 U.S. 389, 399 (1993); *Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004). "[T]o succeed in stating a substantive incompetency claim, a petitioner must present evidence that creates a real, substantial and legitimate doubt as to his competency." *Walker v. Attorney General for State of Oklahoma,* 167 F.3d 1339, 1347 (quotations omitted). Factors relevant to the need for

a competency hearing include the attorney's representation about his client's competency, *United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1235 (10th Cir. 2009), the district court's own observations, *id.* at 1234, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope v. Missouri,* 420 U.S. 162, 180 (1975); *McGregor v. Gibson*, 248 F.3d 946, 954 (10th Cir. 2004). Here, of course, a previous competency hearing had been held, thus the decision "whether to order a second competency exam is a matter wholly within the sound discretion of the trial court." *United States v. Prince,* 938 F.2d 1092, 1095 (10th Cir. 1991).

## Kansas Court of Appeals Decision

The Kansas Court of Appeals addressed this issue, applied established federal law, namely the *Strickland* standard, *see Shopteese* at *10, and found substantial competent evidence that McQuillan's decisions regarding evidence and argument in representing Petitioner at the motion to withdraw hearing were based on reasonable strategy. The Court found no deficient performance, so never examined *Strickland's* prejudice prong, stating:

> McQuillan testified at the K.S.A. 60–1507 hearing that after he was appointed to represent Shopteese, he became familiar with the competency process Shopteese previously had undergone. He stated that he initially had concerns regarding Shopteese's competence when he received the file but did not think it was an issue after reading the plea hearing transcript and meeting with Shopteese in person. During his meetings with Shopteese, McQuillan thought Shopteese "seemed very functional" and "cognizant" when answering questions about the conversations he had with Tuley and about his plea hearing. McQuillan testified that he had no concern regarding Shopteese' ability to

function in a court hearing. McQuillan stated that he did not contact any doctors to determine the effect on Shopteese if prescribed medication was suspended prior to the plea hearing because, based on his reading of the plea hearing transcript, McQuillan felt Shopteese was competent when he entered his no contest pleas. Because he believed Shopteese was competent at the time, McQuillan decided to focus on the issue Shopteese wanted to raise, *i.e.,* attacking the validity of the no contest pleas based on Shopteese's mistaken belief (attributable to the advice he received from Tuley) that he would be eligible for parole from the felony murder conviction in 15 years.

In sum, then, the evidence demonstrates that McQuillan (1) reviewed the plea hearing transcript; (2) met with Shopteese in person; (3) determined Shopteese was competent at the plea hearing, which necessarily averted the need to investigate whether the recommended dosage of medication was being administered to Shopteese prior to the plea hearing; and (4) made a strategic decision to abandon what he believed to be an argument without merit, to wit: that Shopteese was incompetent when he entered his no contest pleas at the plea hearing. Thus, McQuillan's initial failure to investigate medication dosage and his subsequent decision to abandon the competency issue at the motion hearing both were premised on the underlying determination that Shopteese was competent at the plea hearing. In turn, McQuillan's determination about competency was based on an informed, reasonable, and professional assessment of the facts as they existed at the time; thus, McQuillan's performance at the hearing on the motion to withdraw plea was not deficient. Because Shopteese has failed to satisfy the first prong of the *Strickland* test, Shopteese's claim of ineffective assistance of counsel has no merit and the decision to deny his K.S.A. 60–1507 motion for relief is affirmed.

*Shopteese*, at *12 (2011).

**Analysis of Court of Appeals Decision**

Petitioner contends that Mr. McQuillan violated his due process right to

be competent and his Sixth Amendment right to the effective assistance of

counsel at the plea withdrawal hearing by not presenting expert testimony of

his incompetence. More specifically, Petitioner asserts that the Kansas Court

of Appeals opinion is contrary to federal law because it gave deference to

McQuillan's decision not to investigate Petitioner's competency, but the United States Supreme Court has repeatedly held that strategic decisions are not entitled to deference when an attorney fails to investigate.

But the United States Supreme Court has recently reaffirmed that counsel is not ineffective for making reasonable decisions that make particular investigations unnecessary. *Harrington,* 131 S.Ct. at 788. Petitioner's burden is thus to establish that McQuillan's decision not to investigate was necessarily objectively unreasonable from counsel's perspective at the time the decision was made. *See Anderson,* 425 F.3d at 859.

### Prior Medical Opinions on Competence

Petitioner contends that "compelling evidence" of his incompetence was available, as evidenced by the expert testimony presented at his 60-1507 hearing.[2] Specifically, Petitioner points to Dr. Mabugat's opinion that Petitioner would not be competent unless he remained on his medications, to Petitioner's testimony at the plea hearing that he was not on his medications, and to clinical psychologist Barnett's opinion after reviewing the plea transcript that Petitioner was not competent at the plea hearing due to his fluctuating hallucinations, delusions, and low intellectual functioning. But such evidence is not conclusive.

---

[2] The Court does not agree with Petitioner's assertion that experts' opinions are determinative. See *Bryson v. Ward,* 187 F.3d 1193, 1201-02 (10th Cir. 1999), *cert. denied,* 529 U.S. 1058 (2000) ("Defense counsel is often in the best position to determine whether a defendant's competency is questionable.")

But Petitioner asks the Court to "reject" contrary evidence, including the expert testimony of Dr. Yutzy, whom the district court relied on in finding Petitioner competent. Petitioner rejects Dr. Yutzy's opinion because it was based only on a review of records, since he had not examined Petitioner at the time of the hearing. But this fact goes only to the weight, and not to the relevance of Dr. Yutzy's testimony. Cf *Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004) (Social security appeal finding the opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all).

### Attorney McQuillan's Testimony

Petitioner also ignores the testimony of attorney McQuillan, who was appointed to represent Petitioner only five days before his hearing on his motion to withdraw his plea. McQuillan testified at the 60-1507 hearing that he met with Petitioner three times before the hearing, and thoroughly reviewed all expert reports regarding Petitioner's competency, the transcripts of the hearings, and the entire court file, yet found no reason to doubt Petitioner's competency. (R. II, 65, 72). McQuillan also relied on his own interactions with Petitioner, showing he rationally consulted with McQuillan and understood the proceedings against him. McQuillan's initial doubts about Petitioner's competency were also allayed by his review of the extensive and pertinent plea colloquy between the judge and the Petitioner.

He therefore concluded that there was no reason to call expert witnesses or to believe Petitioner's plea should be set aside based on Petitioner's incompetency.

A reasonable attorney, according to Petitioner, would have seen from the file that Petitioner's competency depended on a specific regimen of medication, that Petitioner had not been properly given his medication, and that Petitioner had hallucinations during the plea hearing. But the record shows no psychotic episodes at that time. Instead, Petitioner, who is cross-eyed, attributed the visions/red floaters he saw on the walls during the plea hearing to his vision problems, and agreed that it did not affect his ability to listen or to make decisions. R. IX, Plea hearing, Jan. 30, 2004, pp. 14-15, 37-38. Although Petitioner testified that he had not received his medications for four days, the possibility that his lack of medicine could render him incompetent was thoroughly rebutted by the evidence of record demonstrating his ability to meaningfully dialogue with the court, to rationally confer with his attorney, and to understand the proceedings at the time, as evidenced by his appropriate responses and questions to the court's extensive inquiry into this topic.

**The District Court's Observations**

The Tenth Circuit stresses that "the observations and conclusions of the district court observing that behavior and demeanor are crucial to any

proper evaluation of a cold appellate record. *Prince,* 938 F.2d at 1095."

*United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1234 (10th Cir. 2009).

The district court, at Petitioner's plea hearing, made a thorough and relevant

inquiry, demonstrating not only that Petitioner's plea was voluntary and

knowing, but also but also that it was given by a competent defendant. On

the motion to withdraw the plea, the same court referred to the plea

hearing, saying:

> The Court made a significant inquiry in this case regarding first of all [defendant's] competence to enter the plea. Whether he was on any medication, whether he had any trouble hearing me. I went through a series of questions to which he made responses. At no time during the sentencing hearing did Mr. Shopteese look confused. At times [his counsel] would interject statements in the transcript, but the answers were being made by Mr. Shopteese in direct response to my questions.

*State v. Shopteese,* 283 Kan. at 342.

### Petitioner's Behavior During the Plea Hearing

Petitioner additionally contends that he acted irrationally during the

plea hearing, as evidenced by the fact that his face was painted at the time.

But no such fact appears of record. Petitioner's citation (to R. I, p. 96) is

solely to his request to take judicial notice, so does not establish the fact

asserted. The record neither shows that Petitioner's face was painted during

the plea hearing, nor shows judicial notice of any face painting.

The Court notes, however, that Petitioner appeared at his sentencing

hearing, two months after his plea, with his face painted. *See* R. IX, 3/10/04

hearing, p. 11.) The district court, ever careful to make a thorough record, sua sponte asked about it:

> The Court:  Mr. Shopteese, you have some either ink, something on your face. Could you describe what that is for me please?
>
> A.  It's ink. I did not want my picture to be known to other people in case of certain as you would say avoiding trouble I'd say.
>
> The Court: Yes, sir.

R. IX, p. 11. This colloquy reflects that the face painting was an intentional, albeit unusual, act by Petitioner to disguise himself, and fails to show irrational behavior indicative of incompetency.

The only other unusual matter during the hearing on the motion to withdraw the plea was Petitioner's insistence that he had never signed the plea agreement, that his signature had been forged, and that the transcript of his plea hearing to the contrary was a lie. But a fair reading of the record does not tend to show that this assertion was a product of Petitioner's delusion, rather than of his desperation in an attempt to undue his plea because Petitioner had been misinformed about the length of his sentence. No other unusual statements or acts occurred. *Compare McGregor*, 248 F.3d at 959 (reciting multiple episodes of defendant's "odd behavior.") Neither this nor any other matter alleged by Petitioner shows that his behavior during the plea hearing was so irrational as to compel a finding that Petitioner was incompetent.

The Court finds that a reasonable attorney, situated in the same position as Attorney McQuillan, would find insufficient cause to believe Defendant's competence was compromised. Having independently reviewed the record, the Court finds that the Kansas Court's conclusion that McQuillan's performance was not deficient under *Strickland* was "well within the bounds of a reasonable judicial determination." *Harrington*, 131 S.Ct. at 789. Because a reasonable argument exists that counsel satisfied *Strickland's* deferential standard, as the Kansas Court of Appeals held, habeas relief is unavailable.

### Substantive Incompetency Claim

Petitioner's brief mentions but does not analyze a substantive-incompetency claim, and no such due process claim is included in the habeas petition. Accordingly, that claim is not properly before the Court in this proceeding.

But even if the claim were properly before the Court, the Court's analysis above would lead it to deny the merits of this claim, as the evidence does not create a "real, substantial and legitimate doubt" about Petitioner's competency. *Allen v. Mullin,* 368 F.3d 1220, 1240 (10th Cir. 2004) (internal quotation marks omitted). The Kansas Supreme Court denied Petitioner's claim that his plea was involuntary, necessarily determining that Petitioner was competent. *See Shopteese*, 283 Kan. at 340-41 ("The term "voluntary"

implicitly requires that the defendant be competent.). No showing has been made that this determination was contrary to clearly established federal law.

**Evidentiary Hearing**

The court finds no need for an evidentiary hearing. ("[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record.)" *Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005) *Schriro,* 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

**Certificate of Appealability**

Rule 11 of the Rules Governing Section 2254 Proceedings states that the court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has rejected the constitutional claims on the merits, a petitioner makes that showing by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). *See United States v. Bedford*, 628 F.3d 1232 (10th Cir. 2010). Petitioner has not met this standard as to any issue presented, so no certificate of appealability shall be granted.

IT IS THEREFORE ORDERED that the petition for habeas corpus relief under 28 U.S.C. § 2254 (Dk.1) is denied.

Dated this 29th day of January, 2013, at Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge